1
2
3
4
5
6
7

8           UNITED STATES DISTRICT COURT

9       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   EDWARDO VINCENT OLGUIN,           No.  2:21-cv-0368-JAM-EFB P

12           Petitioner,

13       v.                             FINDINGS AND RECOMMENDATIONS

14   BRIAN KIBLER, Warden,

15           Respondent.

16

17       Petitioner is a state prisoner proceeding through counsel with this petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges his 2017 convictions for violating

19   California Penal Code § 288(a) (lewd and lascivious conduct on a child under fourteen) and (c)(1)

20   (lewd and lascivious conduct on a fourteen-year-old).  ECF No. 1 at 2.  Petitioner alleges that: (1)

21   his trial counsel rendered prejudicially ineffective assistance of counsel by failing to object to

22   testimony regarding the victim's credibility; (2) the trial court denied him his right of

23   confrontation when it took an expert's testimony outside petitioner's presence pursuant to his

24   waiver, because the expert exceeded the permissible scope of his testimony; and (3) the trial court

25   denied him due process by allowing the jury to convict him based on testimony that certain acts

26   may have occurred in October-December 2015 when the Information alleged that those acts

27   occurred on or about August or September 2015.  *Id*.  For the reasons that follow, the petition

28   must be denied.

1

## I. **Background**

The facts, as relayed by the California Court of Appeal[1], are:

Defendant began his sexual abuse of the victim when she was 13 years old and had just started the seventh grade. Defendant was nearly 50 years old and the victim's uncle on her father's side. He was also a convicted child predator. The victim's parents were no longer together and shared custody of her through an informal arrangement. The victim's mother lived in a house with her sister and brother, the victim's maternal aunt and uncle. The victim's father lived in a house with his brother, (defendant), and daughter, B., who was the victim's older half-sister. While the record is less than clear as to the details of the custody arrangement, it appears that during the school year, the victim lived primarily with her mother and stayed with her father every other weekend.

Counts 1 & 2

Defendant sexually assaulted the victim five times between the start of her seventh grade year, in August 2015, and November or December of that year. Each of these assaults occurred during the weekend when the victim was staying at her father's house. The victim testified about the first two assaults in some detail. The first happened during the daytime when she was home alone with defendant. She was in B.'s bedroom, sitting on the bed watching television, when defendant came into the room, asked her a question, and then "started inching his way over to the bed." The victim pushed defendant away when he got too close to her, but he immediately returned to the bed and grabbed her breasts over her shirt. Defendant then started to remove her shirt and bit one of her breasts with his mouth. The victim told defendant to stop and started kicking him, but he continued his assault. Eventually, a noise in the front yard caused defendant to stop and leave the room.

The second assault also happened when the victim was alone with defendant in the daytime during one of the weekends she was at her father's house. Like the first assault, the victim was in B.'s bedroom when defendant came in, and slowly approached her while making small talk. He then grabbed her breasts both over and under her shirt. The victim again told him to stop, saying: "Get off of me." Defendant continued and this time completely removed the victim's shirt. He again bit her breasts. And again, the assault ended when defendant heard a noise and left the room.

The victim did not specifically describe the other three assaults that happened during her seventh grade year, but said they were the same as the first two. Each time, defendant left pink bite marks on her breasts that lasted for two days. As mentioned, these assaults, supporting Counts 1 and 2, ended in November or December 2015.

/////

/////

---

[1] The facts recited by the state appellate court are presumed to be correct where, as here, the petitioner has not rebutted the facts with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Slovik v. Yates*, 556 F.3d 747, 749 n.1 (9th Cir. 2009) (as amended).

The victim continued to stay at her father's house on alternating weekends during the school year, but defendant's abuse went dormant for about six months, during which the victim "started to trust him" again.

Counts 3-8

The abuse resumed in June 2016. The victim spent more time at her father's house during the summer months, staying there for a week at a time every other week. That summer, the victim was enrolled in a STEM (science, technology, engineering, and math) program at the University of the Pacific. The program lasted for about six weeks. During the weeks the victim stayed with her father, defendant drove her to the program in the morning and picked her up at 2:00 p.m. in the afternoon. The victim's father did not get home from work until around 5:00 p.m. Defendant sexually abused the victim every day during the time he was alone with her at the house. He did so in the same manner as before, squeezing and biting her breasts both over and under her clothes. The only difference was defendant "started getting more aggressive," as the victim explained, "squeezing me harder, biting me harder." When she resisted, defendant would say: "Stop, I'll bite harder." Defendant also threatened to "end" her and her family.

The abuse continued throughout the summer and into the victim's eighth grade year. Every sexual assault committed against the victim during this time period happened in B.'s bedroom except for one that occurred in the living room. During that particular assault, defendant did the same things to the victim he had done in the bedroom. But this time, while being assaulted on the couch, the victim could see a lady walking outside the house, apparently through the screen door. The victim screamed to get the lady's attention. Defendant closed her mouth with his hand and pulled her onto the floor with him, saying: "Stop. You're gonna make it worse." The lady briefly stopped and looked into the house, but then walked away.

In September of the victim's eighth grade year, during another of defendant's sexual assaults, he threatened to hurt the victim's best friend and her boyfriend if she told anyone what he was doing. The last sexual assault committed by defendant against his 14-year-old victim occurred the day before Thanksgiving. Defendant assaulted the victim on each of the three days leading up to the holiday. As mentioned, these sexual assaults, occurring between June and November 2016, supported Counts 3 through 8.

Disclosure of the Abuse

The victim disclosed the abuse in November of her eighth grade year. She first told her boyfriend about the abuse, but made him promise not to tell anyone, adding: "I'll tell my dad when the time is right." She then confided in her best friend, who told her to tell her mother and report the abuse to the police. The next morning, this friend pushed the victim to disclose the abuse to her maternal uncle, who was walking both girls to school when the friend said to the victim: "If you don't tell him, I will." When the victim's maternal uncle asked what her friend was talking about, the victim responded, "I'm being molested," and identified defendant as the abuser. The victim appeared "nervous, scared, and she was starting to like tear up" when she disclosed the abuse to her maternal uncle.

The victim's mother was informed of the allegation the same morning and immediately picked her daughter up from school. When she asked the victim why she had not told her about the abuse, the victim "started crying." At home, the

victim revealed details of the abuse to her mother. Her maternal aunt and uncle were also at the house, as were her maternal grandparents. The victim's mother then contacted the victim's father about the allegations and asked him to come over. When her father arrived, he was "upset," but not at defendant.  Instead, he was "mad and yelling" at the victim.  Despite the fact that defendant had previously been convicted of committing similar sex offenses against young girls, the victim's father "kept saying that . . . he wouldn't do that." As the victim described her father's reaction: "He was like, 'What am I supposed to do now?' He was like, 'I'm gonna lose you and my brother.' He was like, 'Why did you do this?' He goes, 'You broke the family up. Why?' Just kept saying 'why' over and over again." Eventually, the victim's father left the house, slamming the door behind him.

The next day, the victim disclosed the abuse to her school counselor, W.  After crying for about 20 minutes, the victim explained her living situation and then "talked about how her 50-year-old Uncle Eddie . . . has been sexually molesting her." She was "shaking, trembling" when she disclosed the abuse to W. We recount relevant portions of W.'s testimony more fully later in the opinion.  For present purposes, we note W. was required to report the allegations of abuse to law enforcement authorities and did so. The victim was interviewed by two patrol officers the same day and provided an account of the abuse that was consistent with her statements to W.

Subsequent Investigation

The detective investigating the victim's allegations of sexual assault against defendant determined that a sexual assault examination would not be fruitful due to the nature of the alleged conduct and the amount of time that had passed; and because defendant lived in the same house where the victim was staying with her father, the detective declined to test her clothing for trace DNA.

The detective briefly spoke to the victim on December 15, 2016. The victim was "very apprehensive" and tightly held onto a teddy bear during the conversation. The victim told the detective that defendant had sexually assaulted her five times while she was in the seventh grade, adding that she knew there were five assaults that year because she had written these incidents down as they occurred, but then destroyed the notes because she "didn't want to remember." The victim also told the detective that defendant tried to "rape her" over the Thanksgiving break of her eighth grade year, but "refused to go into any details regarding that incident." While it is unclear whether the victim was referring to the incident in the living room when she made that remark, she mentioned one of the incidents occurred in that room and refused to answer any of the detective's questions about it. The detective felt the victim was uncomfortable speaking with him and set up an appointment for a forensic interview at the Child Advocacy Center. That interview was conducted about two weeks later. During the forensic interview, the victim provided more details about the abuse than she provided in her previous statements.

The victim continued to see W. for counseling after making the disclosures noted above.  She was "suicidal and depressed." Her grades fell to failing levels. No one on her father's side of the family would speak to her.  During one of her sessions with W., the victim disclosed an incident in which defendant took photographs of her with a Polaroid camera and threatened to "show everyone [her] dirty little secret" if she told anyone about the abuse. This information was passed along to the detective, who determined too much time had passed following defendant's

arrest to conduct a search for the camera or photographs. As the detective explained: "The fact that the defendant lived with his brother, his brother [i.e., the victim's father] did not believe the allegations.  Not that he was uncooperative in our investigation, but he was very standoffish.  He was taking the side of his brother over everything else, basically saying the incident didn't happen.  It was our belief if there was any type of evidence in the house, that it's possible it would have been destroyed by the other occupants of the residence."

Additional Prosecution Evidence

The prosecution also presented testimony from David Love, an expert in CSAAS. He explained for the jury five typical characteristics of children who have been sexually abused: (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed or unconvincing disclosure, and (5) retraction. This evidence was admitted solely to assist the jury in understanding the reasons for an abuse victim's seemingly self-impeaching behavior, such as the failure to immediately report the abuse.  Other relevant aspects of Love's testimony will be set forth later in the opinion.

Finally, the prosecution presented evidence of prior sex offenses committed by defendant.  Most analogous to the present crimes, defendant was previously convicted of committing a lewd or lascivious act on a child under the age of 14 years. This victim, N., was 11 or 12 years old when defendant began sexually abusing her.  Defendant was in his twenties at the time and lived next door to N. and her family.  On multiple occasions during the span of a few years, defendant entered N.'s bedroom window at night when her family was asleep, touched her vagina and breasts, and had vaginal and anal sex with her.  Defendant also had sex with N. in his car on one occasion after they had gone to the fair together, and another time in her garage while her mother was in the house.  N.'s testimony describing these offenses was admitted to establish defendant possessed a propensity to commit such offenses against young girls.

Defendant also committed a sexual assault against N.'s friend, S., one evening when S. was spending the night at N.'s house. S. was 16 years old.  Defendant was 26 years old.  S. initially noticed defendant looking at her from outside the bathroom window while she was taking a shower.  He then came inside the house, entered the bathroom, and, as S. put it, "just tried to wash me a little bit." While doing so, defendant touched S.'s breasts and vagina.  N. then came into the bathroom and told defendant to leave her friend alone.  Defendant left, but returned as S. was drying off and asked if he could help her.  N. again came into the bathroom and told defendant to leave. Defendant left, but returned a third time as S. was getting dressed in N.'s bedroom and again touched her vagina.  Defendant was convicted of sexual penetration by foreign object on S., a person under the age of 18 years.

A third prior sex offense, committed about four years before defendant began abusing N., and about seven years before his sexual assault on S., was also admitted into evidence to prove his propensity to commit such offenses. This victim, J., was 13 years old when defendant, 19 years old at the time, had sex with her. J. met defendant at a concert and told him she was 15 years old.  She later invited him over to her house. While J. did not remember many details about the incident, she did remember defendant left marks on her breasts.  Defendant was convicted of unlawful sexual intercourse with a minor.

/////

Defense Case

The defense case consisted primarily of testimony from the victim's father and his daughter B., the victim's half-sister who was also living at the house where the abuse occurred during the time period relevant to the first three counts.  Both candidly admitted they did not believe the victim's allegations of abuse against defendant.

B. testified she was on doctor-ordered bed rest in July and August 2015 and never left the house during those months except to go to doctor appointments on certain weekday mornings.  Thus, according to B., there was never a time when the victim was at her father's house during those two months that B. was not also at the house.  B. also claimed she was at the house the entire time the victim was there in September of that year. While she was no longer on bed rest, she "didn't do a bunch" and "would stay there all the time." With respect to the remaining three months of the year, B. also claimed to have been home during the weekends the victim was there. B. testified that at no point during that entire period did her and the victim's father leave the victim alone at the house for several hours.

B. moved out of the house in January 2016 and temporarily moved back between April and June of that year. B. confirmed the victim started spending more time at the house in June.  However, as with the time periods already discussed, B. claimed there was never a time the victim was home alone with defendant that month. B. further testified she never saw defendant behave inappropriately with the victim at any time.

The victim's father testified she spent five weekends with him between August and October 2015. He did not work weekends and never left the victim alone with defendant. The victim's father testified that during the only weekend the victim spent with him in August, he stayed at the house with her that Friday night, spent all of Saturday with her participating in an outreach program at his church, stayed home with her that night as well, and spent much of Sunday with her at church services. While he did not specifically account for that Sunday afternoon or evening, the victim's father stated generally that he would either drop the victim off at her mother's house after church on Sundays, or if she stayed that night as well, they "would watch TV or whatever" and he would drop her off the next morning.

According to the victim's father, this same general routine also occurred during the four weekends the victim spent with him in September and October 2015. With respect to September, he initially acknowledged he would occasionally walk a short distance to his mother's house and leave the victim at the house with defendant for "about 30 minutes," but then denied having done so during that month and said he "very seldom" went to his mother's house. The victim's father also acknowledged having the victim the same amount of time in November and December, but did not provide an account of their activities during these months.

The victim's father confirmed that beginning in June 2016, the victim began staying with him for a week at a time.  He worked the day shift Monday through Friday. The victim's father also confirmed B. was living in the house in June and testified she was home most of the time.  When B. was not at home, however, the victim would occasionally watch television in B.'s bedroom.  The victim's father did not know whether or not B. left the victim alone with defendant for an extended period of time that month. Obviously, between July and November, after

1  B. moved out, the victim would have spent a considerable amount of time alone
   with defendant at the house.  The victim's father did not testify otherwise.

2

3  We decline to provide a detailed summary of the remaining defense witness
   testimony. It will suffice to note the victim's father's fiancée, who began dating
   her father in June 2016, frequently came over to the house at night and did not
4  notice anything unusual about the victim's relationship with defendant. One of
   defendant's friends, who sometimes went with him to pick the victim up from the
5  STEM program in the summer of 2016, also testified to their seemingly "regular"
   familial relationship.  One of B.'s friends, who lived at the house with B. between
6  2013 and 2014 when she was 17 years old, testified defendant never behaved
   inappropriately towards her when they were alone together.  And finally,
7  defendant's ex-wife, who was living with defendant during the time period he
   molested N. and S., testified she did not believe he did so. With respect to N., she
8  testified that she would have woken up if defendant was getting out of bed in the
   middle of the night to climb into N.'s bedroom window.

9

10  *People v. Olguin,* No. C085623, 2020 Cal. App. Unpub. LEXIS 2576, at *3-18 (Apr. 27, 2020);

11  ECF No. 11-1.

12      In all aspects relevant to the instant petition, petitioner's appeal of his conviction was

13  rejected by the state appellate court.  ECF No. 11-1 at 42.  The California Supreme Court denied

14  review.  ECF No. 11-9.

15      **II.  Analysis**

16         **A.  Standards of Review Applicable to Habeas Corpus Claims**

17      An application for a writ of habeas corpus by a person in custody under a judgment of a

18  state court can be granted only for violations of the Constitution or laws of the United States.  28

19  U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

20  application of state law.  *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010); *Estelle v. McGuire*, 502 U.S.

21  62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

22      Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

23  corpus relief:

24  An application for a writ of habeas corpus on behalf of a person in custody
    pursuant to the judgment of a State court shall not be granted with respect to any
25  claim that was adjudicated on the merits in State court proceedings unless the
    adjudication of the claim –

26

27  (1) resulted in a decision that was contrary to, or involved an unreasonable
        application of, clearly established Federal law, as determined by the Supreme
        Court of the United States; or

28

7

1
2

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

3   Under § 2254(d)(1), "clearly established federal law" consists of holdings of the United

4   States Supreme Court at the time of the last reasoned state court decision. *Thompson v. Runnels*,

5   705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, __ U.S. __, 132 S.Ct. 38 (2011);

6   *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v. Taylor*, 529 U.S. 362,

7   405-06 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly

8   established and whether a state court applied that law unreasonably." *Stanley*, 633 F.3d at 859

9   (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not

10  be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific

11  legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, __ U.S. __, 133

12  S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 567 U.S. 37, 47-49 (2012) (per curiam)).

13  Nor may it be used to "determine whether a particular rule of law is so widely accepted among

14  the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct."

15  *Id*.  Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said

16  that there is "clearly established Federal law" governing that issue. *Carey v. Musladin*, 549 U.S.

17  70, 77 (2006).

18  A state court decision is "contrary to" clearly established federal law under § 2254(d)(1) if

19  it applies a rule contradicting a holding of the Supreme Court or reaches a result different from

20  Supreme Court precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634,

21  640 (2003).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court

22  may grant the writ if the state court identifies the correct governing legal principle from the

23  Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

24  case.[2] *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*,

25  360 F.3d 997, 1002 (9th Cir. 2004).  A federal habeas court "may not issue the writ simply

26

27

28

---

[2] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 412; *accord Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims.  *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

In evaluating whether the petition satisfies § 2254(d), a federal court looks to the last reasoned state court decision.  *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).  If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, the court may consider both decisions to ascertain the reasoning of the last decision.  *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 131 S. Ct. at 784-85.  This presumption may be overcome by a showing "there is reason to think some other

explanation for the state court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).  Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. *Johnson v. Williams*, 568 U.S. 289, 293 (2013).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d).  *Stanley*, 633 F.3d at 860; *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853.  Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784.

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

## B. **Petitioner's Claims**

Petitioner asserts three claims in this petition, which the court will analyze in turn.  First, petitioner claims that his trial counsel rendered prejudicially ineffective assistance by failing to object when two prosecution experts testified that the victim was credible.  The state appellate court agreed that some of the failures to object fell below constitutionally-minimum competence, but found that the error was not prejudicial:

> [D]efendant argues . . . that defense counsel's failure to object amounted to ineffective assistance of counsel. We disagree.

/////

/////

10

1

### The Victim

2

#### *Challenged Testimony*

3

4

Defendant challenges the following testimony from W., arguing she "directly testified to [the victim]'s credibility."

5

6

7

8

9

10

11

12

13

14

15

16

On cross-examination, following up on W.'s testimony that the victim was enrolled in a special education program due to learning disabilities in the areas of auditory processing, auditory and visual short-term memory, and overall attention, defense counsel asked W. whether such disabilities would "leave her more vulnerable to being manipulated or coerced to make statements that were not true."  W. answered: "I don't see that happening, but I see that because of her language delays it might be more difficult for her to be articulate enough to self-advocate."  Following some back-and-forth discussion, in which W. stated the victim "could be more easily manipulated and be more easily a victim," defense counsel asked: "But to being manipulated into being a victim, can she also be manipulated into making untrue statements she's a victim?"  W. answered: "Well, there's no correlation between a learning disability and that, but there is a correlation between having a learning disability and being susceptible to victimization."  Defense counsel then asked whether W., outside of her cognitive testing of the victim for purposes of placing her in the special education program, knew "whether or not she is an honest or truthful person." W. answered: "No. But I will say that *I found her very credible* with her statement because it was so specific and accurate.  And there were many times that she could have elaborated and made things more serious and she did not." (Italics added.) Defense counsel did not object to W.'s statement regarding the victim's credibility.

17

18

19

20

21

22

23

24

25

26

27

During redirect, the prosecutor asked W. how the victim's cognitive impairment, specifically her inability "to hear someone else's story and . . . consistently repeat it back," would affect defense counsel's suggestion that the victim was "manipulated into giving false statements."  W. answered: "It would be very, very difficult for her to keep the facts straight because she just can't remember things that are said by other people.  For example, if I could state, yesterday I gave her a test called the WRAML.  It's a Wide Range Assessment of Memory and Learning. And part of that test is I just say two [para]graphs.  And there's 40 questions. All she has to do is remember — she doesn't even have to like do any higher level thinking skills.  All she has to do is tell me there's a dog and his name is Oscar and they were fishing, you know, just some specific facts about that story. They don't have to be in order and there's no comprehension involved.  And out of like 40 items of just the paragraph, she was only able to remember about five to seven items.  She can't remember facts that other people told her. *That's why I believe that she's more credible.*  Because she was so consistent about her story over and over, the facts never changed.  When she said it stopped, it stopped.  When she said it started back, she was consistent on the dates." (Italics added.)  Defense counsel did not object to this testimony.

28

/////

11

1    Defendant also challenges the following testimony from Love.  As mentioned,
     Love testified as an expert in CSAAS.  During his explication of the fourth
2    general characteristic of child sexual abuse victims, i.e., delayed or unconvincing
     disclosure, Love explained how memory can be impaired by a traumatic event
3    and affected by a child's participation in multiple interviews following that event.
     When asked what role consistency plays in determining whether or not an
4    allegation of abuse is fabricated, Love answered: "*Well, the more consistent a*
     *child is, the more probable it's accurate*." (Italics added.)  Later, during recross-
5    examination, defense counsel posed a hypothetical scenario in which a child
     makes a false accusation of abuse in order to get the accused in trouble and asked:
6    "Is there a way to determine whether or not that child is being honest or not
     outside of using this syndrome [i.e., CSAAS]?" Love answered: "*Yes, outside the*
7    *syndrome, but not within the syndrome*." (Italics added.) While defense counsel
     did not object to this testimony either, defendant argues on appeal that it
8    "indirectly vouched for [the victim]'s credibility" and "bolstered [W.]'s opinion"
     regarding her credibility.
9

10

11   Defendant further complains, also without having objected below, that Love
     indirectly vouched for the victim's credibility by citing statistics concerning the
12   infrequency with which children fabricate abuse. During Love's direct
     examination, at the conclusion of his explanation of the fifth characteristic of
13   sexually abused children, i.e., retraction, Love stated a study done by the
     "National Center for Child Abuse and Neglect found as a 'best estimate' that *'one*
14   *percent of children who make accusations flat out fabricate or lie or don't tell the*
     *truth.'*" (Italics added.) Later, on cross-examination, defense counsel asked Love a
15   series of questions concerning whether he had seen any children who made abuse
     accusations that turned out to be fabricated. Love answered that the organization
16   he worked for, Valley Community Counseling Services, had identified "eight or
     nine cases where the child was pretty clear about it initially and then later on we
17   discovered that the — what they were saying, they were — something else was
     going on. But keep in mind I treat six to eight hundred kids a year in our clinic in
18   San Joaquin County. So, yes, have we seen some? Yes. Absolutely. *The National*
     *Center said about one percent. Pretty consistent with us*." (Italics added.) When
19   asked whether other studies had found the "rate of false reporting, misreporting,
     fabrication, confabulation" to be "closer to five to eight percent," Love pointed
20   out the National Center for Child Abuse and Neglect had the largest database to
     analyze, but agreed there were other studies showing a higher percentage, adding:
21   "But it's still pretty darn small if you think about the total hundred percent end."
     (Italics added.)
22

23

24   Additionally, in response to a question regarding whether a certain scholar had
     discredited CSAAS, Love disagreed with that characterization and added: "In his
25   article he agrees — and he's got a number of articles. But he kind of consistently
     agrees that secrecy, helplessness, are pretty consistent with kids. He states in at
26   least one of his articles — and I apologize I couldn't quote which one exactly it
     was — that *he believes that most children are truthful when they come forward*
27   *and say they were sexually molested*." (Italics added.)

28

                                          12

Finally, defendant also challenges for the first time on appeal Love's testimony about behavior that is consistent with having experienced a traumatic event such as sexual abuse, including "drug or alcohol use," "inappropriate age level sexual activity," and "clinical depression," creating a "higher risk of cutting, self-mutilation and suicide." Again, despite failing to object below, defendant argues this evidence, coupled with testimony from W. and the victim concerning the victim's depression and suicidal thoughts, amounted to improper "profile evidence."

**B.**

*Analysis*

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215, 233 Cal. Rptr. 404, 729 P.2d 839.) This right "entitles the defendant not to some bare assistance but rather to effective assistance. [Citations.]  Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his diligent conscientious advocate.' [Citations.]" (*Ibid*.) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816, 129 Cal. Rptr. 438, 548 P.2d 1110.) "'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."'" (*In re Harris* (1993) 5 Cal.4th 813, 832-833, 21 Cal. Rptr. 2d 373, 855 P.2d 391; Strickland v. Washington (1984) 466 U.S. 668, 687 [104 S. Ct. 2052, 80 L.Ed.2d 674, 693] (Strickland).)

**1.  *Deficient Performance***

We must first determine whether or not defense counsel's failure to object to the challenged testimony fell below an objective standard of reasonableness.

"The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well equipped as the expert to discern whether a witness is being truthful." (*Coffman and Marlow, supra*, 34 Cal.4th at p. 82.) Likewise, "[l]ay opinion about the veracity of particular statements by another is inadmissible on that issue." (*People v. Melton* (1988) 44 Cal.3d 713, 744, 244 Cal. Rptr. 867, 750 P.2d 741.) "[T]he reasons are several. With limited exceptions, the factfinder, not the witnesses, must draw the ultimate inferences

from the evidence. . . . A lay witness is occasionally permitted to express an ultimate opinion based on [her or] his perception, but only where . . . the concrete observations on which the opinion is based cannot otherwise be conveyed. [Citations.] Finally, a lay opinion about the veracity of particular statements does not constitute properly founded character or reputation evidence [citation], nor does it bear on any of the other matters listed by statute as most commonly affecting credibility [citation]. Thus, such an opinion has no 'tendency in reason' to [prove or] disprove the veracity of the statements." (Ibid.)

Beginning with W.'s testimony, contrary to defendant's argument on appeal, this witness was not testifying as an expert, but rather as a percipient witness to whom the victim disclosed the sexual abuse she suffered at the hands of defendant. Nevertheless, as noted above, she still was not permitted to vouch for the veracity of the victim's disclosure of abuse.  Whether or not defense counsel's failure to object to that improper testimony fell below an objective standard of reasonableness is another matter.  "In reviewing an ineffective assistance of counsel claim, courts do not generally second guess counsel's tactical decisions. [Citations.] 'Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action [or inaction] "might be considered sound trial strategy." [Citation.]' [Citation.]" (*In re Alcox* (2006) 137 Cal.App.4th 657, 665, 40 Cal. Rptr. 3d 491.)

Here, in response to W.'s first statement regarding the victim's credibility, rather than object, defense counsel instead questioned W. about various inconsistencies between the victim's initial statement to her and subsequent statement in which she first disclosed the incident involving Polaroid photographs, ending that line of inquiry with: "So you don't know if someone had manipulated her into making this second statement to you?" W. answered: "No. Of course not.  I can only take what she told me."  Given the fleeting nature of W.'s first objectionable statement, defense counsel may well have determined an objection and admonition would only have served to highlight her opinion that the victim was telling the truth, and following up with specific questions about inconsistencies between the victim's statements was a better tactic to deal with that objectionable testimony.  We cannot, however, say the same with respect to the second time W. voiced that opinion.  By the time W.'s opinion regarding the victim's credibility was repeated on redirect, we conclude the failure to object fell below an objective standard of reasonableness.

Turning to Love's expert testimony, we first note that "[e]xpert testimony on 'the common reactions of child molestation victims,' known as CSAAS theory evidence, 'is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident-e.g., a delay in

14

reporting-is inconsistent with his or her testimony claiming molestation.' [Citation.] '"Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior."' [Citation.]" (*People v. Julian* (2019) 34 Cal.App.5th 878, 885, 246 Cal. Rptr. 3d 517 (*Julian*).)  However, "such evidence 'is not admissible to prove that the complaining witness has in fact been sexually abused.' [Citation.]" (*Ibid*.)

We conclude Love's testimony went beyond the permissible scope of CSAAS testimony.  The most obvious transgression was his repeated estimate that only about one percent of children make false allegations of abuse. As the Court of Appeal explained in *Julian*: "The expert providing CSAAS testimony may not give '"general" testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused.' [Citation.]  Nor is it proper for an expert to present 'predictive conclusions' [citation], such as alleged child abuse victims 'should be believed' or 'abused children give inconsistent accounts and are credible nonetheless.' [Citation.]  Such predictive conclusions go beyond the scope of CSAAS evidence and may confuse the jury.  '[T]he jurors' education and training may not have sensitized them to the dangers of drawing predictive conclusions.' [Citation.]  Where expert opinions on the statistical probability of guilt are admitted, the jury may be 'distracted' from its 'requisite function of weighing the evidence on the issue of guilt,' and may rely instead on this 'irrelevant' evidence. [Citation.]" (*Julian, supra*, 34 Cal.App.5th at pp. 885-886.) In that case, as here, the CSAAS expert testified that children rarely fabricate allegations of sexual abuse and estimated the percentage of false allegations to be "as low as one percent of cases to a high of maybe 6, 7, 8 percent of cases." (*Id*. at p. 885, italics omitted.)  The court concluded this probability evidence "invited jurors to presume [the defendant] was guilty based on statistical probabilities, and not decide the evidence properly introduced in the case." (*Id*. at p. 886; see also *People v. Wilson* (2019) 33 Cal.App.5th 559, 570-571, 245 Cal. Rptr. 3d 256.) As in *Julian*, we conclude "there is no justification for counsel's failure to object to [Love's] statistical evidence on false allegations. It was inadmissible and it improperly suggested [defendant] was guilty based on statistical probabilities that were irrelevant to this case." (*Id*. at p. 888.)

We also conclude Love's testimony indicating consistency in a child's statements is a predictor of veracity and victims of trauma often experience depression and suicidal thoughts transgressed the confines of CSAAS testimony.  With respect to the former, such testimony also amounts to a predictive conclusion, i.e., children who provide consistent statements should be believed. With respect to the latter, Love himself acknowledged the general experiences of children who suffer trauma is not part of CSAAS.  As previously explained, CSAAS testimony is admissible only to disabuse the jury of common misconceptions about child sexual abuse and the seemingly self-impeaching behavior of victims of such abuse.  The Attorney General offers no theory under which an abuse victim's post-trauma depression or suicidal thoughts might be misunderstood by the jury in a way that would arguably impeach his or her credibility.  Instead, that evidence

was transparently offered to establish that the victim fit the profile of someone who suffered trauma, and was therefore more likely to have been sexually abused by defendant.  While there is nothing wrong with introducing evidence of the victim's depression and suicidal thoughts, or with the prosecution arguing for such an inference, the problem lies in employing the testimony of an expert to bolster it. (*See People v. Bledsoe* (1984) 36 Cal.3d 236, 251, 203 Cal. Rptr. 450, 681 P.2d 291 ["Lay jurors are, however, fully competent to consider such evidence in determining whether a rape occurred, and '[p]ermitting a person in the role of an expert to suggest that because the complainant exhibits some of the symptoms of rape trauma syndrome, the victim was therefore raped, unfairly prejudices the appellant by creating an aura of special reliability and trustworthiness'"].) Defense counsel's failure to object to this evidence also fell below an objective standard of reasonableness.

## 2. *Prejudice*

We now turn to the question of prejudice and conclude there is no reasonable probability that, but for defense counsel's failure to object to the challenged evidence recounted above, the result of the proceeding would have been different. (*Strickland, supra,* 466 U.S. at p. 687.)

We begin by noting the case against defendant, independent of the challenged testimony, was very strong.  The victim's testimony recounting the abuse she endured at the hands of defendant was both internally consistent and consistent with her prior statements disclosing the abuse.  Those prior statements were also consistent with each other.  While the victim disclosed additional details about the abuse in her forensic interview, and did not disclose the Polaroid incident until later, Love's properly-admitted testimony concerning delayed disclosure informed the jury this was not uncommon among children who have suffered sexual abuse. In addition to the victim's testimony, her mother, the uncle she confided in on the way to school, the friend who prompted her to do so, her boyfriend, and W. each testified to the emotion the victim displayed when talking about the abuse. Additionally, as we discuss in greater detail later in the opinion, the victim's account of defendant's offenses against her was similar to the prior sexual offenses defendant committed against N., S., and J., providing strong evidence of defendant's propensity to commit such offenses against young girls. For all of these reasons, the jury was likely to have considered the victim's testimony to be credible even without the objectionable evidence recounted above.

Defendant disagrees, arguing, the victim "was not a compelling witness" because "there was considerable evidence that she lied about at least some of the 2015 incidents, for numerous witnesses made a strong case that she could not have been alone at the house with [defendant] in August and September, much less alone with him in the room where bed-ridden [B.] almost continuously remained." We acknowledge B. testified she was on doctor-ordered bed rest in August of that year, she never left the house except to go to doctor appointments, and these doctor appointments were during the week when the victim was not at the house anyway. Thus, if believed, the victim was never alone with defendant in B.'s

16

bedroom during the month of August. And while B. testified she was not on bed rest in September, she claimed she was home the entire time the victim visited for the two weekends she stayed at her father's house that month as well. We also acknowledge the victim's father generally corroborated B.'s testimony concerning the time she was on bed rest and remained at the house. He also provided a fairly detailed account of his and the victim's activities during the weekend she spent with him in August and claimed the same general routine also occurred during the two weekends she spent with him in September.

Defendant argues this testimony must have swayed at least part of the jury because it submitted a question asking whether Counts 1 and 2 had to have occurred in August and September, respectively, or instead could be based on events occurring in October, November, and December.  As defendant points out, Count 1 alleged the lewd or lascivious conduct occurred "[o]n or about August 2015" and Count 2 alleged the lewd or lascivious conduct occurred "[o]n or about September 2015."  In response to the jury's question, without objection, the trial court reread an instruction informing the jury the "on or about" language simply meant the offense took place "reasonably close" to the dates stated in the information. The jury also requested readback of the victim's testimony concerning the five incidents of abuse in 2015.  Shortly after hearing that readback of testimony, the jury returned its verdict convicting defendant on all counts.

We do not attach the same significance to the foregoing events as defendant. As we explain in greater detail later in the opinion, the victim did not specifically claim the first incident of abuse occurred in August, or that the second incident of abuse occurred in September.  Instead, the victim testified to five incidents of abuse occurring sometime between August and November or December of her seventh grade year. The jury was properly instructed it could use any two of those incidents to find defendant guilty of the lewd conduct alleged in Counts 1 and 2, as long as the jury unanimously agreed about which lewd acts he committed, and as long as those incidents were reasonably close in time to August and September, respectively. After hearing the readback of the victim's testimony concerning these five incidents, the jury returned its verdict. Nothing about these events indicates the jury disbelieved the victim's testimony about any of the abuse.

We conclude there is no reasonable probability of an outcome more favorable to defendant had his trial counsel objected to the improper testimony challenged in this claim on appeal.

*People v. Olguin*, 2020 Cal. App. Unpub. LEXIS 2576, at *19-37.

Petitioner argues that the state courts' determination that his counsel's failure to object to the disputed testimony did not cause prejudice was an unreasonable application of the *Strickland* standard.  This is a difficult argument to make, especially where, as here, the state court has provided thoughtful reasoning supporting its determination of no prejudice.  This court must defer

17

1  to that reasoning unless it is impossible that fair-minded jurists could disagree that the reasoning

2  contravenes U.S. Supreme Court precedent.  *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

3       According to petitioner, it was unreasonable for the state court to rely on the following

4  evidence that supported the victim's testimony: (1) her consistent descriptions of the abuse; (2)

5  her emotion in recounting the abuse; (3) and petitioner's similar behaviors in abusing other girls

6  in the past.  Unfortunately for petitioner, he points to no Supreme Court cases holding that the

7  consideration of such evidence in analyzing the prejudice prong of a *Strickland* claim is improper.

8  That fact alone is fatal to petitioner's claim.

9       At bottom, petitioner's arguments challenging the admission of certain evidence at trial

10  (governed by state evidentiary law) and the consideration of that evidence by the appellate court

11  amount to an attempt to litigate issues that are outside the scope of federal habeas review.

12  "Section 2254(d) reflects the view that habeas is a guard against extreme malfunctions in the state

13  criminal justice systems, not a substitute for ordinary error correction through appeal."

14  *Harrington*, 562 U.S. at 102-03 (internal quotation marks omitted); *Bradshaw v. Richey*, 546 U.S.

15  74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct

16  appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

17       Petitioner also argues that the state court ignored evidence unfavorable to the prosecution

18  in making its determination.  But, again, petitioner points to no Supreme Court precedent

19  requiring a state court to exhaustively discuss all evidence at trial in making a prejudice

20  determination under *Strickland*.  The state court discussed the evidence supporting the verdict and

21  concluded that, in the face of that evidence, there was no reasonable probability that petitioner

22  would have received a more favorable outcome without counsel's errors.  That conclusion was

23  reasonable.

24       Petitioner next argues that his waiver of his right to be present during the testimony of

25  CSAAS expert Love was not knowing and intelligent because, after petitioner executed the

26  waiver, Love testified to matters beyond the permissible scope of his expert testimony.  The state

27  court rejected this claim as well, reasoning:

28

Defendant also claims we must reverse his convictions because he did not knowingly and intelligently waive his right to be present during Love's testimony. Not so.

"A criminal defendant's right to be personally present at trial is guaranteed under the federal Constitution by the confrontation clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment.  It is also required by section 15 of article I of the California Constitution and by sections 977 and 1043." (*People v. Concepcion* (2008) 45 Cal.4th 77, 81, 84 Cal. Rptr. 3d 418, 193 P.3d 1172.)  Such a defendant "clearly has a right to be present when witnesses testify at trial." (*Id.* at p. 82; *United States v. Gagnon* (1985) 470 U.S. 522, 526 [105 S. Ct. 1482, 84 L.Ed.2d 486].)

"A defendant's right to presence, however, is not absolute.  The high court has stated that a defendant's 'privilege may be lost by consent or at times even by misconduct. [Citation.]' [Citations.]" (*People v. Gutierrez* (2003) 29 Cal.4th 1196, 1202, 130 Cal. Rptr. 2d 917, 63 P.3d 1000 (*Gutierrez*).)  And although section 977, subdivision (b)(1), states, "in all cases in which a felony is charged, the accused shall be personally present at the arraignment, at the time of plea, during the preliminary hearing, *during those portions of the trial when evidence is taken before the trier of fact*, and at the time of the imposition of sentence" (italics added), this provision "does not preclude a defendant from being 'voluntarily absent' during the taking of evidence under section 1043, subdivision (b)(2)." (*Gutierrez, supra*, at p. 1203.) That provision states: "The absence of the defendant in a felony case after the trial has commenced in his [or her] presence shall not prevent continuing the trial to, and including, the return of the verdict in any of the following cases: [¶] . . . [¶] (2) Any prosecution for an offense which is not punishable by death in which the defendant is voluntarily absent." (§ 1043, subd. (b)(2).)

Thus, we "must determine, on the whole record, whether defendant's absence was knowing and voluntary." (*People v. Connolly* (1973) 36 Cal.App.3d 379, 385, 111 Cal. Rptr. 409; *Gutierrez, supra*, 29 Cal.4th at p. 1205 ["In determining whether a defendant is absent voluntarily, a court must look at the 'totality of the facts'"].)

Here, at the start of the afternoon session on the last day of the prosecution's case-in-chief, defense counsel informed the trial court defendant was not feeling well and wanted to be excused for the afternoon. The trial court then asked defendant, "do you waive your appearance for this afternoon?"  Defendant answered: "Yes, sir." The trial court also asked defendant whether he understood both that he had the right to be present and that the matter could be continued to another time if he wished.  To both questions, defendant answered: "Yes."  The trial court then asked the prosecutor: "Now how many witnesses do we have this afternoon?" The prosecutor indicated the only witness that afternoon would be the CSAAS expert. The trial court again asked defendant whether he understood he had the right to be present, to which defendant answered: "Yes, I do." The court then asked whether defendant gave up that right.  Defendant answered: "Yes."  Defendant also signed a form in open court waiving his right to be present during the remainder of the

19

day's proceedings, after which the court found defendant "made a knowing, intelligent, voluntary waiver of his right to be present."

As defendant acknowledges in his briefing on appeal: "The court carefully inquired of [defendant] personally in order to ensure that his waiver was knowing and intelligent." The problem, defendant argues, was that Love's testimony went beyond the scope of permissible CSAAS testimony in the ways already discussed. This, according to defendant, rendered invalid his waiver of the right to be present during Love's testimony.  We are not persuaded.

This situation is not like the cases defendant cites in support of this claim. Most analogous, but readily distinguishable, is *People v. Johnson* (2013) 221 Cal.App.4th 943, 164 Cal. Rptr. 3d 864 (*Johnson*). In *Johnson*, a murder case, the defendant waived her right to be present for the readback of certain testimony during the jury's deliberations. She was not informed the jury also wanted a demonstration of the gun's operation. That demonstration was conducted by the bailiff outside the defendant's presence without her knowledge. The Court of Appeal held the trial court violated the defendant's statutory and constitutional right to be present during the bailiff's demonstration, during which he spoke extensively to the jury about the gun's operation, "essentially amount[ing] to testimony" from an unsworn witness and "result[ing], in effect, in the jury's receipt of evidence." (*Id*. at p. 955.) Unlike *Johnson*, where the defendant waived her right to be present while already-admitted testimony was read back for the jury but did not waive her right to be present while new evidence in the form of a demonstration was effectively admitted against her, here, defendant essentially acknowledges he validly waived his right to be present during most of Love's testimony, i.e., his CSAAS testimony, but claims he did not knowingly do so for the portions of the testimony transgressing the confines of permissible CSAAS testimony. However, there is always the possibility that a witness's testimony will exceed the scope of permissible content. When it does, the defendant, through counsel, may object and request a curative admonition, raise the evidentiary issue on appeal if the objection is overruled, or raise ineffective assistance of counsel if no objection is made, as in this case. What the defendant may not do is transform an evidentiary error into a constitutional violation by voluntarily absenting himself or herself from the witness's testimony altogether.

*People v. Olguin*, 2020 Cal. App. Unpub. LEXIS 2576, at *37-41.

Petitioner argues that this analysis was unreasonable, but, again, he fatally fails to identify any U.S. Supreme Court precedent holding that an otherwise valid waiver of personal presence is vitiated if evidentiary errors occur in the defendant's absence.  Petitioner cites a U.S. Court of Appeals for the Ninth Circuit case and a California appellate court case, but, in both of those cases, the court found that the defendant had been misled about what would occur in his or her

1    absence. *United States v. Berger*, 473 F.3d 1080, 1095 (9th Cir. 2007); *People v. Johnson*, 221

2    Cal. App. 4th 943, 957 (2013).  These cases are therefore not pertinent to the issue because: (1)

3    they are not from the U.S. Supreme Court and (2) they are readily distinguishable.  As petitioner

4    has not shown that the state court's resolution of his Confrontation Clause claim was

5    unreasonable, this claim must be denied.

6        Lastly, petitioner argues that he was denied his due process right to notice of the charges

7    against him because the charging documents alleged that Counts 1 and 2 occurred "on or about"

8    August or September 2015 but the evidence showed a possible range of conduct between August

9    and December 2015, allowing the jury to convict him for conduct alleged to have happened

10   outside of August and September.  In essence, petitioner claims that this was unfair because he

11   was put on notice to mount a defense concerning August and September, but not October through

12   December.  The state court rejected this claim as well:

> Defendant also contends the trial court prejudicially erred and violated his
> constitutional rights by instructing the jury Counts 1 and 2 need only have been
> committed "on or about" the dates alleged in the information. However,
> defendant's trial counsel did not object to this instruction at trial. "Failure to object
> to instructional error forfeits the issue on appeal unless the error affects
> defendant's substantial rights. [Citations.] The question is whether the error
> resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818,
> 299 P.2d 243. [Citation.]" (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927,
> 61 Cal. Rptr. 3d 903.) We conclude there was no error, much less a miscarriage of
> justice.

> **A.**

> **Additional Background**

> In Counts 1 and 2, defendant was alleged to have engaged in lewd or lascivious
> conduct with the victim when she was 13 years old. As set forth in greater detail
> earlier in the opinion, the victim testified to five incidents of such conduct
> between August 2015 and November or December of that year. Neither her
> testimony nor any of the other prosecution evidence established the exact dates of
> these incidents of abuse. They occurred during the weekends the victim stayed at
> her father's house, but those specific weekends were not established.

> Count 1 alleged the lewd or lascivious conduct occurred "[o]n or about August
> 2015" and Count 2 alleged the lewd or lascivious conduct occurred "[o]n or about
> September 2015." It is apparent the months of August and September were chosen
> because the victim described the first two incidents of abuse in greater detail than
> the other three incidents.

> Defendant attempted to establish lack of opportunity to commit these offenses. As
> mentioned, the victim's father testified the victim spent only one weekend with

21

him in August and provided a fairly detailed account of their activities that weekend, claiming he stayed at the house with her that Friday night, spent all of Saturday with her participating in a church outreach program, stayed home with her that night as well, and spent much of Sunday with her at church services. The victim's father also testified the same general routine occurred the two weekends the victim spent with him in September. And while the victim's father acknowledged, at least initially, that during September he occasionally left the victim at the house with defendant for about 30 minutes while he went to his mother's house, B. testified that she was at the house the entire time the victim was there during both August and September. Thus, according to the victim's father and B., there was never a time during August and September that the victim was at the house alone with defendant.

The jury was given an instruction combining CALCRIM Nos. 207 and 3501, stating in relevant part: "The defendant is charged with lewd act upon a child in Count 1 sometime during the period of August of 2015; [¶] Count 2 sometime during September of 2015; [¶] The People have presented evidence of more than one act to prove that the defendant committed these offenses. You must not find the defendant guilty unless: [¶] One, you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed for each offense, or you all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period and have proved that the defendant committed at least the number of offenses charged. [¶] It is alleged that the crimes occurred on or about the dates stated. The People are not required to prove that the crime took place exactly on that day but only that it happened reasonably close to that day."

During the jury's deliberations, it submitted a question asking whether Counts 1 and 2 had to have occurred in August and September, respectively, or instead could be based on events occurring in October, November, and December. In response, without objection, the trial court reread the foregoing instruction. The jury also requested readback of the victim's testimony concerning the five incidents of abuse in 2015. A short time after hearing the readback, the jury returned its verdict convicting defendant on all counts.

**B.**

**Analysis**

In general, an accusatory pleading need not state the exact date on which a crime was committed. (§ 955.) "Under modern pleading procedures, notice of the particular circumstances of an alleged crime is provided by the evidence presented to the committing magistrate at the preliminary examination, not by a factually detailed information." (*People v. Jennings* (1991) 53 Cal.3d 334, 358, 279 Cal. Rptr. 780, 807 P.2d 1009.) Thus, an information may allege a crime was committed "on or about" a certain date, and a variance of a few months is routinely upheld on appeal. (*See People v. Peyton* (2009) 176 Cal.App.4th 642, 660-661, 98 Cal. Rptr. 3d 243 [variance of about one year held to be immaterial]; *People v. Triplett* (1945) 70 Cal.App.2d 534, 541-542, 161 P.2d 397 [variance of two months].)

However, while the information need not plead the exact date of the offense, "when the prosecution's proof establishes the offense occurred on a particular day to the exclusion of other dates, and when the defense is alibi (or lack of opportunity), it is improper to give the jury an instruction using the 'on or about'

22

language." (*People v. Jennings*, supra, 53 Cal.3d at pp. 358-359.) For example, in *People v. Jones* (1973) 9 Cal.3d 546, 108 Cal. Rptr. 345, 510 P.2d 705 (overruled on another point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 108 Cal. Rptr. 2d 409, 25 P.3d 618), where the prosecution's witness testified to buying marijuana from the defendant on a particular day, and the defendant offered evidence that he was in Texas on that date, it was error to give the jury an instruction stating "if the jury finds that the crime was committed it is not necessary that the proof show that it was committed on that precise date; it is sufficient if the proof shows that the crime was committed on or about that date." (*Jones* at p. 556-558 & fn. 8.)

Similarly, in *People v. Barney* (1983) 143 Cal.App.3d 490, 192 Cal. Rptr. 172 (*Barney*), a case in which the defendant was convicted of committing two lewd or lascivious acts on his granddaughter, the granddaughter testified the second charged act occurred on a particular Sunday. Although other evidence widened that time period to include that entire weekend, it excluded other time periods. (*Id.* at p. 498.) The defense, as in this case, was lack of opportunity and was supported by testimony claiming the defendant's son and daughter-in-law were present during the relevant time period. This court held the trial court erred in instructing the jury that the prosecution "need not specifically prove the time of the charged offense." (*Ibid.*) As we explained: "[I]f the defense is alibi or, as here, lack of opportunity to commit the offense, the exact time of commission becomes critically relevant to the maintenance of the defense. An instruction which deflects the jury's attention from temporal detail may unconstitutionally impede the defense. The defendant is entitled as a matter of due process to have fixed the time of commission of the offense in order to demonstrate he [or she] was elsewhere or otherwise disenabled from commission of the alleged offense." (*Id.* at p. 497.)

Defendant relies heavily on *Barney, supra*, 143 Cal.App.3d 490 in arguing the trial court erred in providing a similar instruction in this case. That case, however, is distinguishable. Most importantly, unlike Barney, here, the prosecution's evidence did not establish two discrete incidents of abuse, one occurring during a particular weekend in August and the other occurring during a particular weekend in September, to the exclusion of other time periods. Instead, the victim testified to five incidents of abuse occurring sometime between August and November or December of her seventh grade year. More specifically, the victim did not testify the first incident occurred in August. She testified it occurred on a weekend after school began. She acknowledged school began in August, but did not specifically testify she was abused that month. Nor did she testify the second incident of sexual abuse occurred in September. Thus, unlike *Barney*, where the evidence established the charged offense occurred during one specific weekend, here, it would be entirely consistent with the victim's testimony if both charged offenses occurred in September, or for one to have occurred in September and the other in October, or for both to have occurred in October.

*Barney* is distinguishable in another important respect. There, the prosecution adduced evidence of other acts of sexual abuse, committed against the same victim, that were close in time to the charged acts of abuse, but that evidence was admitted only to establish defendant was more likely to have committed the charged offenses. (*Barney, supra*, 143 Cal.App.3d at p. 498.) Accordingly, while the prosecution relied on a particular discrete event occurring during a specific weekend to establish the second charged count of lewd conduct, there was a danger the jury may have believed the defendant's lack of opportunity defense with respect to that particular weekend but nevertheless convicted him of that

23

crime because a different act of abuse occurred at another time "near the weekend in question." (*Ibid.*) In contrast, here, the victim testified to five incidents of sexual abuse, any two of which could support defendant's convictions in Counts 1 and 2, as long as the jury unanimously agreed as to which two were proved beyond a reasonable doubt. The jury was so instructed.

In sum, the first predicate of the rule precluding an "on or about" instruction, i.e., "the prosecution's proof establishes the offense occurred on a particular day to the exclusion of other dates" (*People v. Jennings*, *supra*, 53 Cal.3d at pp. 358-359), is not present in this case. Nor is there the danger that the jury convicted defendant of an offense other than the ones charged because Counts 1 and 2 were based on all five incidents and the unanimity instruction required the jury to agree on which two were proved beyond a reasonable doubt. There was no error in providing the jury with the challenged instruction.

*People v. Olguin*, 2020 Cal. App. Unpub. LEXIS 2576, at *47-55.

Under the Due Process Clause of the U.S. Constitution, a criminal defendant is entitled to "adequate notice of the charges against him." *Lopez v. Smith*, 574 U.S. 1, 5-6 (2014). This general rule is too abstract to support habeas relief on claims that a specific form of notice was required. *Id.* Accordingly, this court cannot derive from the general notice requirement a more specific rule concerning the use of "on or about" language in charging documents, and petitioner cites no U.S. Supreme Court case providing a more specific notice rule that could apply here. The use of such language in charging documents *has* been litigated in the California state courts, as the state court discussed here. California law put defendant on notice that, due to the "on or about" language, he should not limit his defense to the specific months charged. As there is no U.S. Supreme Court case that holds otherwise, petitioner's habeas claim must be denied.

### III.   Recommendation

For the reasons stated above, it is hereby RECOMMENDED that the petition for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v.*

*Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  *See* Rule 11, Rules Governing § 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  August 24, 2021.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE